Submitted on record and briefs March 29, affirmed October 25, 1989

## STATE OF OREGON,
*Respondent,*

*v.*

## NICHOLAS HOLCOMB,
*Appellant.*

(CR8-0815-JT; CA A49626)

781 P2d 396

Gary D. Babcock, Public Defender, and Henry M. Silberblatt, Salem, filed the brief for appellant.

Dave Frohnmayer, Attorney General, Virginia L. Linder, Solicitor General, and Ann Kelley, Assistant Attorney General, Salem, filed the brief for respondent.

Before Graber, Presiding Judge, and Joseph, Chief Judge, and Riggs, Judge.

GRABER, P. J.

Riggs, J., dissenting.

## GRABER, P. J.

Defendant appeals his conviction, after a jury trial, for driving under the influence of intoxicants. ORS 813.010. He assigns error to the admission of the Intoxilyzer test results, arguing that the test was not administered in compliance with the relevant statutes and administrative rules. We affirm.

Defendant was stopped by State Police Trooper Huskey for speeding, having a broken tail light, and crossing the center line. Huskey administered field sobriety tests and concluded that defendant was under the influence of intoxicants. He took defendant to jail, where defendant consented to take a breath test. The evidence card that recorded the test result is unclear, because the card had been used before, during the calibration of the machine. The numbers printed on it could be .07, .08, .17 or .18. Huskey testified that he saw the machine register .17 on the digital display when it printed the test result. The test was recorded on an audio cassette; on the tape, defendant was heard to ask about the result and to read ".17" out loud.

Defendant argues that the evidence card, and therefore the test result, are inadmissible, because they do not comply with ORS 813.160 and OAR 257-30-020(1). ORS 813.160 provides, in pertinent part:

"(1)   To be valid under ORS 813.300:

"* * * * *

"(b)   Chemical analyses of a person's breath shall be performed * * * according to methods approved by the Department of State Police."

OAR 257-30-020(1) provides, in pertinent part:

"(c)   Test Procedure:

"* * * * *

"(D)   Slide the bonded edge of the multi-copy Evidence Card vertically, straight downward into the printer slot until the card is resting on the firm stop, with the hard copy facing the operator. * * * After the Air Pump automatically shuts off, the sound of the printer should be heard printing on the Evidence Card the first two digits showing on the Digital Display. The letter 'A' for Air Blank, will precede the two digits printed on the card. * * *

"* * * * *

"(F)    * * * After a proper sample is given, the sound of the printer will be heard, automatically printing the letter 'B' for breath, plus the first two digits of the display on the Evidence Card. * * *

"* * * * *

"(H)    Remove the Evidence Card from the printer slot and retain as evidence. Record the test result, indicated opposite the letter 'B' on the Evidence Card, on the Operator's Checklist."

Defendant contends that the rule implicitly requires that a blank card be inserted into the machine, because otherwise the test result would be unreliable.

Even if defendant is correct,[1] his objection affects the weight of the evidence, not its admissibility. Our cases distinguish between procedures that affect the actual performance of the test, and thus the admissibility of the results, and procedures that simply record the fact that the operator performed the correct procedure. In the second situation, errors affect only the weight that the trier of fact gives the evidence.

In *State v. Ramsey,* 17 Or App 665, 523 P2d 601 (1974), for example, the officer recorded an ampoule number that was not on the list of previously certified ampoule batch numbers. The officer testified that he had used a certified ampoule but that he had made a mistake in writing down the number. We held that it was a question for the jury whether the officer had used a certified ampoule. If he had not, the error would have affected the performance of the test. However, if he had used a certified ampoule and simply recorded an incorrect number, it would affect the weight of the test results as evidence, not admissibility. *See also State v. Olson,* 88 Or App 271, 744 P2d 1327 (1987).

We reversed a suppression order in *State v. Olson,*

---

[1] In prior cases, we have distinguished between procedures that the rules and checklist mandate and procedures that, although not expressly required, may increase the accuracy of the test performance or the recording of the results. We have refused to suppress evidence for departures from the latter type of procedures. *See, e.g., State v. Sweeney,* 88 Or App 358, 745 P2d 439 (1987), *rev den* 305 Or 22 (1988); *State v. Allen,* 74 Or App 275, 702 P2d 1118, *rev den* 300 Or 111 (1985); *State v. McClary,* 59 Or App 553, 651 P2d 145 (1982). Here, we assume, without deciding, that OAR 257-30-020(1) requires the operator to use a previously unused evidence card.

*supra.* There, the officer filled out the checklist, as the rules require, but did not check the box for step "F," which includes the procedure for attaching a clean mouthpiece before the driver blows into the machine. The officer testified that he had completed the test properly, and we said:

> "Completion of the checklist is not an act performed for its own sake. The checklist and the officer's testimony together establish that a valid result was produced." 88 Or App at 274.

In *State v. Roe,* 95 Or App 477, 770 P2d 69, *rev den* 308 Or 142 (1989), there was a one-digit difference between the serial numbers of the testing machine on the evidence card and on the checklist. We stated that

> "it was preposterous for the trial judge to conclude that an incorrect writing of the serial number on the checklist is by itself a basis for suppressing the results of this Intoxilyzer test. It has nothing to do with performance of the test or its accuracy as evidence." 95 Or App at 480. (Citation omitted.)

Those cases demonstrate that the checklist is a means to describe the performance of the test; its completion does not affect the results themselves. Similarly, the evidence card is a means to record the results of the test; it does not affect the accuracy of the way in which the test was administered. There is reliable evidence of the result that the machine displayed when the test was completed.[2] The evidence card was only an additional means to record the result that the machine had already produced. The card and the officer's testimony together are sufficient to establish a foundation for admission of the evidence card and the test result. *See State v. Olson, supra; State v. Ramsey, supra.* Therefore, the trial court did not err. The weight of the evidence was a question for the jury.

Affirmed.

**RIGGS, J.,** dissenting.

The majority's position, carried to its logical conclusion, would make the regulations governing administration of Intoxiliyzer tests meaningless, insofar as they establish a

---

[2] Defendant does not dispute that the machine was working properly and that the officer performed the test correctly, except for the use of the previously used evidence card.

threshold for determining admissibility of this kind of evidence in a trial. The trier of fact would be permitted to weigh the significance of any testing error. The majority labels the use of a test card a procedure "that simply record[s] the fact that the operator performed the correct procedure," despite the fact that the test card is often the only evidence of the result of an Intoxilyzer test. If that is so, it is difficult to imagine what procedure the majority would find "affect[ed] the actual performance of the test." As the majority itself notes, we held in *State v. Roe,* 95 Or App 477, 480, 770 P2d 69, *rev den* 308 Or 142 (1989), that the test for evaluating whether a testing error warrants exclusion is whether the error is related to "performance of the test or its *accuracy as evidence.*" (Emphasis supplied.) Surely whether a test card is clean and therefore clearly legible affects "its accuracy as evidence."

The legislature authorized the Oregon State Police to approve methods for performing chemical analyses of a person's breath. ORS 813.160. The rules are specific, and those who administer breath tests know or should know them. I see no reason why they should not be followed. I would exclude the results of the Intoxilizer test.

I dissent.